22934

In the Matter of Rodney A. PEEPLES, Circuit Court Judge, Second Judicial Circuit, Respondent.

(374 S. E. (2d) 674 )

Supreme Court

*Asst. Atty. Gen. James G. Bogle, Jr.,* Columbia, *Examiner.*

*Thomas E. McCutchen,* of *Whaley, McCutchen, Blanton & Rhodes,* Columbia, *for respondent.*

Heard Oct. 18, 1988.

Decided Dec. 9, 1988.

*Per Curiam:*

Respondent, Circuit Judge of the Second Judicial Circuit, is charged with several acts of judicial misconduct. A Panel of Hearing Masters found Respondent had (1) lent the prestige of his office to advance the private interests of another; (2) given false testimony at a civil trial; and (3) served as executor of an estate while a judge. The Judicial Standards Commission, affirming these findings and, in addition, holding that Respondent had engaged in the practice of law, recommended he receive a public reprimand. We agree with its recommendation as to the appropriate sanction.

## FACTUAL BACKGROUND

The charges against Respondent derive from his representation of Pauline H. Knight (Pauline), a client who became, as well, a very close friend. They first became acquainted in 1964. During the ensuing years Respondent, as her attorney, prepared a number of Wills for Pauline.

In April, 1972, Pauline married Wilkes Knight (Wilkes). After residing in Orangeburg for several months, the Knights moved to Barnwell where they lived next door to Respondent until their return to Orangeburg in April, 1974. During this period the Knights became affectionately attached to Respondent's two daughters, whom they regarded as their grandchildren.

On August 29, 1972, Wilkes sold a laundromat business to Will Kelly (Kelly), his stepson from a previous marriage. The contract of sale, prepared by an attorney other than Respondent, provided that Kelly pay $300 per month to Wilkes until his death and, if he predeceased Pauline, until her death.

In 1973 Respondent prepared two Wills for Pauline. After certain specific bequests, both Wills left to Wilkes the residue of Pauline's estate for his life with remainder to Respondent's older daughter; both also named Wilkes executor and Respondent alternate executor.

After his election in February as Circuit Judge, but prior to taking office in December, Respondent prepared a final Will for Pauline, on April 17, 1974. This Will left the entire estate to Wilkes for his life, remainder equally to Respondent's daughters. Wilkes was named executor and Respondent alternate.

On July 20, 1983, Pauline was placed in an Orangeburg nursing home because of failing health. On August 22, Wilkes died. Immediately thereafter, Pauline granted a power of attorney to Elroy Dantzler. Following execution of the power of attorney, Dantzler assumed the management of Pauline's personal affairs, which consisted primarily of payment of bills and receipt of income.

Respondent then had Pauline moved to a nursing home in Barnwell. He signed her admission papers as responsible party for any nursing home bills not paid by Pauline.

When Respondent was made aware by Dantzler of the terms of the 1972 laundromat sale, he twice phoned Kelly, requesting that the $300 payments due Pauline be made. Kelly denied that he owed any amount. In a final telephone conversation, Respondent demanded the payments stating, according to Kelly, "that if ... I didn't pay it then the judicial system would have to work in getting the money out of me."

Respondent next communicated with Kelly by letter, written on judicial stationery, which stated in part:

> In complete fairness to this 77 year old lady, I would again respectfully request that you reconsider your position concerning the payment of the $300 per month to Pauline during her lifetime as mandated by paragraph four of Wilkes' will dated August 9, 1983, as well as set forth in the agreement of August 29, 1972, which is recorded in Book 389 at page 301 of the Orangeburg County records. It is elementary that no one can predict the cost or extent of necessary medical care for Pauline in the future and it is very clear to me that *you legally must pay the $300 per month to Pauline* for her lifetime. I sincerely tell you that I do not want to have a disagreement concerning this matter, *but on behalf of Pauline I must insist that you commence these payments*, including the months of September and October of 1983.
> Let me please respectfully ask that you confer with an attorney of your choosing concerning this matter ....
> [Emphases supplied].

Thereafter, Kelly commenced a Declaratory Judgment action to determine his obligation under the 1972 agreement.

At a scheduled non-jury hearing Respondent, during cross-examination, testified:

Q. Judge Peeples, do you have any interest in this matter other than the fact that you are friends with Mrs. Pauline Knight?

A. No sir, just trying to help this lady who doesn't have any kin folks other than third or fourth cousins.

Q. All right, sir. Have you ever prepared a will for Mrs. Knight?

A. Yes, I have. I've prepared probably five wills, I'd say, in the ten years that I represented her.

Q. And do you have presently a will that you prepared for her?

A. No sir, I don't have it.

Q. Do you know where it is?

A. Yes sir, I know where it is.

Q. And do you know what it contains?

A. Yes sir.

Q. And as a matter of fact, Judge Peeples, does that will contain provisions for you . . .

At this point, an objection was interposed by Pauline's attorney, resulting in the following colloquy between Court and counsel:

MR. NESS: Your Honor, I'm going to object to that will. It's going to be hearsay. The will is not in evidence. It's irrelevant as to this action.

THE COURT: I don't think it's fair to. . . . I've got no idea what the will says but I don't think her will . . . In the first place, I'm not going to permit him or require him to divulge the contents of some lady's will who is sitting out there in the nursing home. I don't think that's fair and I'm not going to permit it.

MR. BRYANT: All right, sir. I was doing that in an attempt to show that Judge Peeples has an interest greater than that which he . . .

THE COURT: Well, whether he does or he does not, a will is a very sacred document and I don't know whether he drew it as judge, attorney, or close friend but whatever capacity, I'm not going to require anybody who assists somebody to divulge publicly the contents of their will.

At the conclusion of the hearing, the Circuit Judge ordered Kelly to make the $300 payments to Pauline for life. Kelly's appeal from the Circuit Court order was pending before this Court when Pauline died on June 11, 1986.[1] Upon her death, Respondent assumed the duties of executor of Pauline's estate.

## DISCUSSION

The complaint alleges several acts of misconduct against Respondent.

First, he is charged with having drafted a Will naming him alternate executor and making his daughters beneficiaries.[2] The Examiner contends this conduct violates the Code of Professional Responsibility for attorneys.[3] We agree.

In *In re Rentiers*, 297 S. C. 33, 374 S. E. (2d) 672 (1988), we recently held that a lawyer who drafts a Will in which he is a beneficiary, without making full disclosure of the potential conflicts of interest, violates DR 5-105(A). The same rule applies with equal force where the beneficiaries are members of the attorney's family. Respondent failed to make full disclosure to Pauline and did not urge that she seek independent advice from another lawyer. We, therefore, conclude that DR 5-101(A) was violated.

The Hearing Masters and the Commission both next found that Respondent's actions in attempting to collect the $300 payments for Pauline violated Code of Judicial Conduct Canon 2(B), which prohibits a judge from lending the prestige of his office to advance the private interests of others. We agree.

Respondent made several telephone calls seeking payments from Kelly, in one of which he made reference to use of the judicial system. These telephone conversations were followed by a letter on judicial stationery insisting upon

---

[1] Finding that the agreement had been rescinded prior to Wilkes' death, we reversed the judgment of the Circuit Court. *Kelly v. Peeples*, 294 S. C. 63, 362 S. E. (2d) 636 (1987).

[2] Both parties agree that Respondent asserted no undue influence upon Pauline in the drafting of the Wills.

[3] Violation of the Code of Professional Responsibility, even prior to taking office, constitutes judicial misconduct. *See* Rule on Judicial Discipline and Standards, Supreme Court Rule 34, § 1(b)(2).

payment. Respondent misused the prestige of his office to advance the private interests of another.

The Commission further found that Respondent's actions constituted the practice of law, a violation of Code of Judicial Conduct Canon 5 F. We agree.

The practice of law is not limited to "the conduct of cases in courts" but includes "all advice to clients, and all action taken for them in matters connected with the law." *In re Duncan*, 83 S. C. 186, 65 S. E. 210 (1909). It is the *character* of the services rendered, not *where* they are rendered, which determines whether the acts constitute the practice of law. *State ex rel. Daniel v. Wells*, 191 S. C. 468, 5 S. E. (2d) 181 (1939).

By his actions in seeking to collect the $300 payments, Respondent engaged in the practice of law.

The Hearing Masters and Commission next found that Respondent testified falsely at the Declaratory Judgment trial. Specifically, they held that Respondent had failed "to disclose the true nature of his connection with Pauline Knight and the fact that his daughters could inherit a substantial sum."

Respondent was asked if he had any interest "in this matter." The question, at the very least, was ambiguous as to whether it referred to the Declaratory Judgment action or to Pauline's Will. The question did not necessarily call for disclosure of his daughters' interest as beneficiaries under her Will, a subject altogether separate from that involved in the Declaratory Judgment action. Under the circumstances, Respondent's answer was responsive to the question propounded to him.

Moreover, assuming the question was intended to invoke a response concerning his interest in the Will, Respondent was confronted with the dilemma of safeguarding on the one hand or violating on the other his attorney-client relationship by revealing the contents of the Will. The presiding Judge himself recognized this problem and, *sua sponte*, terminated further cross-examination on that issue.

In view of the ambiguity on this issue, and applying the "clear and convincing" standard required for establishing a factual finding, we hold that perjury was not committed by Respondent.

Finally, both the Hearing Masters and Commission ■ found Respondent had violated Canon 5 D(1) of the Code of Judicial Conduct by his service as executor of Pauline's estate. We disagree.

Canon 5 D generally prohibits a judge from serving as executor or other fiduciary. An exception is provided, however, for the estate of a member of the family, which includes a "person with whom the judge maintains a close familial relationship." The record clearly supports the finding of a close familial relationship between Respondent and Pauline.

The Hearing Masters, nevertheless, found a violation of Canon 5 D(1), which prohibits service as executor when an estate "becomes involved in adversary proceedings in the court on which he serves or one under its appellate jurisdiction."

This was error. At the time the estate was created by Pauline's death, the Declaratory Judgment litigation was not in the Circuit Court but was on appeal to the Supreme Court. Accordingly, Respondent did not become executor until the matter was beyond the jurisdiction of the Circuit Court. Therefore, no violation of Canon 5 D(1) was committed.

In summary, Respondent engaged in the following acts of misconduct: (1) while an attorney, he prepared a Will naming his daughters beneficiaries without making a full disclosure of the potential conflicts of interest; (2) in attempting to collect the $300 payments, he lent the prestige of his office to advance the interests of another; and (3) he engaged in the practice of law.

Based upon these findings, a public reprimand is the appropriate sanction.

Public reprimand.